NO. 07-00-0371-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL A

NOVEMBER 14, 2001

_____

DAVID EARL JOHNSON JR., APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

_____

FROM THE 64TH DISTRICT COURT OF SWISHER COUNTY;

NO. B3222-9907CR; HONORABLE JACK R. MILLER, JUDGE

_____

Before BOYD, C.J., and REAVIS and JOHNSON, JJ.

In this appeal, appellant David Earl Johnson Jr. challenges his conviction of involuntary manslaughter and the resulting jury-assessed sentence of ten years confinement in the Institutional Division of the Department of Criminal Justice. In pursuing that challenge, appellant presents five points of asserted error in which he posits: 1) the evidence was legally insufficient to show that he recklessly caused the death of the minor

child Anthony Lynn Culfer (Anthony); 2) the trial court not only abused its discretion by submitting the question of involuntary manslaughter to the jury, but the evidence is also factually insufficient to support a finding that he caused the death of the victim by smothering him; 3) by submitting the question of involuntary manslaughter, the trial court abused its discretion and deprived him of the due course of law guaranteed by article 1, section 19 of the Texas Constitution; 4) by submitting the question of involuntary manslaughter to the jury, the trial court abused its discretion and denied him due process "because the federal standard is the minimal standard required to enforce the U. S. Const. Fifth Amendment"; and 5) by submitting the question of involuntary manslaughter, the trial court abused its discretion and denied him the due process to which he was entitled "under the U.S. Const. Fourteenth Amendment, applying the Fifth Amendment to the States." Disagreeing that reversible error exists, we affirm the judgment of the trial court.

The nature of appellant's challenges is fact intensive in character and requires us to recount pertinent portions of the trial evidence. On March 20, 1989, at approximately 8:48 p.m., fourteen-month-old Anthony was brought to the emergency room of the Tulia Hospital by Ronda Fore, his mother. Ronda was accompanied by appellant, her boyfriend. Ronda reported to hospital personnel that Anthony had been suffering from a runny nose. At the time of Anthony's arrival, he had no pulse or respiration signs. The emergency room physician, Dr. William Childress, and Edith Gilliam, the nurse on duty at the time, noticed Anthony's face was blue and his hands and feet were cold. They concluded he was dead. Because Dr. Childress thought Anthony had been dead for somewhere around

2

an hour, he requested Tulia Municipal Judge Janet Freemen to order an autopsy to determine the cause of death.

Tulia police officers James Hart and Donny Harlan were dispatched to the hospital and took some pictures of the dead child. They noticed an abrasion on Anthony's forehead and some type of mark above his lip. Officer Harlan, the senior officer present, was told by Judge Freeman not to question anyone until after an autopsy was performed.

Until the evening of March 20, 1989, Anthony had basically been a healthy child. Some two weeks before that date, Anthony had an ear infection treated by his doctor. The doctor had not noted any respiratory infection at that time. On the day of his death, as was usually done while his mother worked, Anthony was taken to a Tulia day nursery by his mother. The day care workers at the nursery observed that he seemed healthy and happy, did not show any ascertainable signs of illness, and was not injured while there. The workers were surprised to hear of Anthony's death because of his apparent good health. The child's aunt, Tina Wright, had seen him at play on March 20 and opined that he was acting normally with no signs of illness.

On March 21, 1989, Dr. Ralph Erdmann performed an autopsy on the child, which had been ordered by Swisher County Justice of the Peace Marie Rucker. In the course of the autopsy, Erdmann notice a slight abrasion on Anthony's forehead and some kind of mark on his lip, which was slightly swollen. Erdmann found that the child's lungs were somewhat abnormal and removed portions to be microscopically examined. As a result

3

of his examination, Erdmann concluded that Anthony died of a mild case of acute interstitial pneumonitis associated with acute septic and toxic shock. Thus, he found that Anthony died of natural causes.

In 1993, Ronda appeared at the Tulia police station and made a statement to Officer Donald Dunn implicating appellant in Anthony's death. As a result of that statement, the investigation into Anthony's death was reopened. She gave two sworn statements to Dunn which were some two weeks apart. In the first of those statements, she averred that appellant smothered Anthony with a pillow and, in the other, that appellant had smothered the child with his hand. Because of the differences in the statements, Dunn continued his investigation. In the course of the investigation, on August 18, 1993, appellant gave a handwritten statement to Amarillo Police Officer Chance Coberly dealing with the events of the evening Anthony died. Although appellant said he was at work after 6:40 p.m., was not present at the home during the critical times on the night in question and did not return until Anthony was found lifeless, his work records did not show that he was at work after 6:40 p.m. After this investigation, the case was submitted to the Swisher County Grand Jury in 1993, but no indictment was returned. The only autopsy available in 1993 was the one performed by Erdmann.

In 1998, Tulia Police Chief Jimmy McCaslin asked the Texas Rangers to determine if further investigation was warranted. Texas Ranger Dwayne Williams obtained the case file, and interviewed a number of witnesses. He then obtained an order to exhume the

4

body from Justice of the Peace Rucker. She then ordered Tarrant County Medical Examiner Marc Krouse to conduct another autopsy.

Doctor Krouse testified that he had performed between 9,000 and 10,500 autopsies. During the course of those autopsies, he had examined about 1600 mummified or decomposed bodies. Prior to conducting an autopsy on Anthony's body, the doctor reviewed the records of Dr. Erdmann's autopsy. In examining the photographs taken in connection with Erdmann's autopsy, he took particular notice of the abrasion above the upper lip slightly to the left of the child's midline. He opined that it was an abrasion that was caused either by scraping or crushing of the skin and it occurred close enough to the time of Anthony's death that little swelling had developed. He also noted that there was a foamy material in the child's mouth, which he believed was the product of pulmonary edema, which was consistent with a finding of asphyxia. Asphyxia, he explained, was a fatal deprivation of oxygen to the brain and heart. The doctor also characterized the injuries as being consistent with the use of some sort of force against the face of the child.

Dr. Krouse investigated Anthony's medical records kept by his treating doctor and, considering the testimony as to his condition in the time immediately prior to his death, disagreed with Erdmann's conclusion as to the cause of death. It was his belief that if Erdmann's conclusion was correct, there would have been more evidence of a shortness of breath. As a result of his autopsy, he recommended that the cause of death be changed to suffocation and the cause of death as homicide.

5

Doctor William Anderson, a deputy chief medical examiner in Orlando, Florida, also testified that what Dr. Erdmann characterized as interstitial pneumonia was "acute lung injury, a deoxygenation of the lungs." In his view, Anthony died of "respiratory and acute respiratory failure. Nothing that had been hanging around for days as a pneumonia might, but something that's very acute." He opined that what is described as interstitial pneumonia "is actually not an infection thing at all, but a response to an injury." This type of injury, he said, "would be consistent with something, among one of the possibilities something being placed over the mouth nose area." Doctor Anderson did not believe that Anthony's death was caused by a virus because the response of his body that was described by Dr. Erdmann could not be the result of such an infection.

Ronda testified that on the day of his death, she was working at a nursing home. Appellant's mother had picked up Anthony from day care and, after she got off work, Ronda picked up Anthony, his two-year-old sister Marlene, and his four-year-old brother, Brandon. When she got home, she began preparing dinner and appellant came home. Anthony was "fussy," so she put him down and gave him a bottle to try to quiet him, but "he didn't want it." Ronda said that appellant was "mad" because Anthony was being noisy and appellant wanted to watch Star Trek, his favorite TV show. Appellant put a pillow over Anthony's face while Anthony was screaming and crying. Ronda averred that she told appellant to stop and he did so for a moment but then "started back up." Ronda then went over and removed the pillow while Anthony gasped for air. Ronda then returned to the

kitchen.  While she was there she heard Anthony scream a couple of times and then there was silence.

Sometime after that, Brandon came into the kitchen and told her that something was wrong with Anthony.  Ronda ran into the living room and saw Anthony lying on the couch with his arms above his head and his face was blue.  She called appellant, who was outside, and he came into the room and started doing CPR in an attempt to revive Anthony.  Ronda said that appellant continued the CPR for five or so minutes without success, so she told appellant they needed to take Anthony to the hospital.  Instead of driving directly to the hospital, they took the other two children by Ronda's sister's house, dropped them off and then went to the hospital.  When they arrived there, she was told the child was dead.  She was upset and asked appellant what had happened.  Appellant replied that he did not know and that it was better left alone.

When cross-examined, Ronda admitted she told appellant's attorney a week before the trial that she had not seen appellant put a pillow over Anthony's face.  She also admitted that when she was questioned at the hospital about Anthony's death, she did not tell anyone that she saw appellant place a pillow over the child's mouth. She also admitted she did not go to the police until 1993 after she dreamed she saw appellant putting a pillow over Anthony's face.  In her 1993 statement, she said she saw appellant place the pillow over Anthony's face and she did not make him quit.  Again, in 1993, about three weeks after the first statement, she gave the police another statement in which she said she did

7

not remember a pillow, but that appellant had used his hand to cover Anthony's mouth. In 1998, she gave another statement in which she again said appellant used a pillow and she tried to stop him. The grand jury did not return an indictment in 1993, but in 1998, after an additional investigation, the instant prosecution was commenced.

Marlene Ballard testified that at the time of the death, she was two years old, but she remembered seeing appellant place a pillow over Anthony's mouth and when the pillow was removed, he was not moving.

Appellant presented several character witnesses, who stated that both Ronda and Marlene had bad reputations for being truthful. He also presented the testimony of Dr. Sparks Veasey, a forensic pathologist. Although Veasey admitted he was aware of reports that appellant placed his hand over the mouths of Anthony and another child and held it over them until they quit crying, after examining the autopsy reports and the police reports, he averred that he could not determine the cause of Anthony's death.

We have listed the relevant evidence in this case in somewhat exhaustive detail. In determining whether the evidence supports the jury verdict, we must bear in mind that it is the jury's exclusive function to determine the credibility of the witnesses and the weight to be given their testimony, and in doing so, they are entitled to consider all the circumstances surrounding the death. Our review of the evidence satisfies us that a reasonable jury could conclude that appellant recklessly caused Anthony's death by covering his mouth in an attempt to quiet him, and that conclusion would not be so against

8

the overwhelming weight of the evidence as to be manifestly unjust. Appellant's first two points are overruled.

With regard to the remainder of appellant's points, he made no trial objection to the court's action in including a charge on involuntary manslaughter in his instructions to the jury. Indeed, with the exception of expressing his opinion that the State should be required to elect whether it was going with a charge that appellant smothered Anthony with a pillow or by other means unknown to the grand jury, trial counsel opined that the charged "looks fine to us." When a defendant requests or does not object to the inclusion of a lesser-included offense, such as manslaughter in this case, a defendant has accepted the benefit of that instruction and is estopped from complaining on appeal that the evidence failed to establish all the elements of the lesser offense. *See State v. Lee*, 818 S.W.2d 778, 781 (Tex.Crim.App. 1991), *overruled on other grounds*, *Moore v. State*, 969 S.W.2d 4, 10 (Tex.Crim.App. 1998); *see also State v. Yount*, 853 S.W.2d 6, 9 (Tex.Crim.App. 1993).

Additionally, even if the question was preserved for appellate review, the trial court did not err in submitting the manslaughter charge. The evidence indicating that appellant was only trying to quiet the child so he could watch his program, together with the fact that he immediately performed CPR on the child after he was found to be unconscious, could reasonably be interpreted by the jury as indicating the death was caused recklessly. When evidence from any source raises an issue that a lesser-included offense may have been committed, it is proper to charge the jury on that offense. *Ormsby v. State*, 600

9

S.W.2d 782, 785 (Tex.Crim.App. 1979); *Moore v. State*, 574 S.W.2d 122, 124 (Tex.Crim.App. 1978). Either party may insist that a charge on a lesser-included offense be given in a proper case. *Pennington v. State*, 644 S.W.2d 64, 67 (Tex.App.–Austin 1982), *aff'd*, 697 S.W.2d 387 (Tex.Crim.App. 1982). In determining whether a charge on a lesser-included offense should be given, the questions confronting the court are: 1) is the lesser-included offense included within the proof necessary to establish the charged offense, and is there any evidence that if the defendant is guilty, he is only guilty of the lesser offense. *Royster v. State*, 622 S.W.2d 442, 446 (Tex.Crim.App. 1981) (opinion on reh'g). The evidence in this case meets both those requirements. Accordingly, appellant was not denied any of his federal or state constitutional rights by the submission of the manslaughter question to the jury. Appellant's points three through five are overruled.

In sum, all of appellant's points are overruled and the judgment of the trial court is affirmed.

John T. Boyd
Chief Justice

Do not publish.

10